## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WINNING CONNECTIONS, INC.,                )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )    Civil Action No. 1:05CV02397(GK)
                                          )
WILLIAM BRADFORD "BRAD" CHISM, et al.     )
                                          )
          Defendants.                     )
_____)

## PLAINTIFF'S MOTION FOR EXPEDITED PRELIMINARY INJUNCTION

Plaintiff Winning Connections, Inc. ("Winning Connections"), by and through its

undersigned counsel, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Civil

Rule 65.1, hereby moves for an expedited preliminary injunction seeking the following relief:

- Enjoining Defendants from using any Winning Connections information, software, data, or any marketing materials or forms modeled on Winning Connections' materials that they wrongfully took from the company;

- Enjoining Defendants from contacting any current or prospective Winning Connections clients, as identified in the Winning Connections' database;

- Enjoining defendants from hiring, or working with, Winning Connections' computer and computer systems manager; and

- Enjoining defendants from making reference in their marketing materials or verbal statements to Winning Connections, or any action, work, or success that occurred while they were working for Winning Connections.

Plaintiff also respectfully requests that the Court set an expedited hearing date on January 3,

2006, or as soon thereafter as is convenient for the Court, to consider this matter. Plaintiff also

requests that the Court require Defendants to respond to expedited discovery requests no later than

December 27, 2005, and to appear for depositions as noticed on December 28 and 29, 2005. The

expedited nature of this request, and the emergency discovery sought, is necessary given that

Defendants are misappropriating stolen information from Plaintiff, and, upon information and

belief, that a key Winning Connections' employee and contractor, Mr. Ilro Lee, may begin working for Defendants upon his return from vacation that began Sunday, December 18, 2005. Defendants will have sufficient time to respond to this Motion, if a hearing is set on or shortly after, January 3, 2006.

Proposed orders addressing expedited discovery and hearing date, and the merits, are attached.

Dated:  December 19, 2005

Respectfully submitted,

David J. Farber (415899)
Susan E. Baldwin (477241)
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C.  20037
(Tel) 202-457-6000
(Fax) 202-457-6315
dfarber@pattonboggs.com
sbaldwin@pattonboggs.com

*Attorneys for Plaintiff*

999953v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WINNING CONNECTIONS, INC.,            )
                                       )
            Plaintiff,                  )
                                       )
      v.                                )   Civil Action No. 1:05CV02397(GK)
                                       )
WILLIAM BRADFORD "BRAD" CHISM, et al.   )
                                       )
            Defendants.                 )
_____)

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR EXPEDITED PRELIMINARY INJUNCTION

Defendants William Bradford "Brad" Chism, Chad Gosselink, and Corporate John Doe 1

("Defendants") are stealing Plaintiff Winning Connections, Inc.'s ("Plaintiff" or "Winning

Connections") confidential and proprietary information and misrepresenting themselves to Winning

Connections' existing and potential clients, all in an effort to steal Winning Connections' business

for their own newly formed company through illegal means.  For these reasons, Winning

Connections requests that the court issue a preliminary injunction:

- Enjoining Defendants from using any Winning Connections information, software, data, or any marketing materials or forms modeled on Winning Connections' materials that they wrongfully took from the company;

- Enjoining Defendants from contacting any current or prospective clients, as identified in the Winning Connections' database,

- Enjoining defendants from hiring, or working with, Winning Connections' computer and computer systems manager, and

- Enjoining defendants from making reference in their marketing materials or verbal statements to Winning Connections, or any action, work, or success that occurred while they were working for Winning Connections.

## I. INTRODUCTION

Winning Connection is a small, family and friends company, that over the past eight years has established itself as the premier telephone voter contact and advocacy group in the United States for progressive causes and candidates. Defendants Chism and Gosselink have been a core part of the management team, and have worked for Winning Connections for years. The two individuals have, in the past several months (though they have just recently notified Winning Connections), decided to end their tenure with the company and directly compete with it. Defendants, however, improperly began business after having: (1) wrongfully taken the company's confidential and proprietary business information; (2) directly misrepresented their actions, and the actions of others, to Winning Connections in an attempt to conceal their theft; (3) engaged in a massive destruction of evidence to hide their actions; and (4) willfully and falsely represented their new venture in marketing materials to third parties, including Winning Connections' clients. Defendants are about to start poaching other key Winning Connections' employees, including Mr. Ilro Lee, the company's computer database manager.

Defendants' actions violate *PepsiCo, Inc. v Redmond*, 54 F.3d 1262, 1265 (7th Cir. 1995), the leading precedent addressing nearly identical misappropriations of confidential business information and trade secrets. In that case, the Seventh Circuit affirmed application of the "inevitable disclosure doctrine" and prevented a similarly situated senior marketing employee from moving to a competitor after lying to his employer about where he would be going, even though the employee had no non-compete agreement. Defendant Chism's direct lie to Winning Connections, and Defendants' conspiracy with Mr. Lee to do the same thing, leads to the same conclusion here.

Even the limited evidence extracted from the Winning Connections' laptop used by Defendant Chism presents a clear picture of Defendants, over the past three months, stealing Winning Connections' business materials, plans, client and prospective client contacts and lists, and

plotting to steal the company's proprietary computer programs, bringing them squarely within the holding of *DoubleClick, Inc. v. Henderson*, 1997 WL 731413 (Sup. Ct. N.Y. County 1997), and *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 125 (E.D.N.Y. 1997). *DoubleClick*, an unreported but heavily cited decision, is particularly on point here – in that case the employees at issue started a competing business after: (1) copying DoubleClick's confidential business plans and spreadsheets and turning them into their new company's business plans and spreadsheets, just as Defendant Chism's emails indicate he was doing here; and (2) solicited clients for their new business after making DoubleClick presentations to the same prospects, again, just as Defendants have done here. Defendants' improper use of their former employer's confidential information should be enjoined, just as it was in *DoubleClick*.

Further, Defendants have also run afoul of the Lanham Act in falsely representing Winning Connections' accomplishments and awards as their own in their marketing materials. Indeed, Defendants have gone one step further, and have been inviting prospective clients to cocktail parties that the clients thought were Winning Connections' parties, when in fact they were not. Again, there is precedent directly on point -- *Riggs Investment Management Corp. v. Columbia Partners, LLC*, 966 F. Supp. 1250, 1267 (D.D.C. 1997) -- where Judge Lamberth enjoined the very same type of misleading conduct. Given Defendants' repeated falsehoods, and their theft of company property, injunctive relief is necessary in this case.

## II. FACTS

Winning Connections' Unique Business Model and Impressive Record of Success

Created by Mr. John Jameson in 1996, Winning Connections is a small business with under a dozen personnel, specializing in voter contact initiatives for political and other campaigns. Verified

Complaint[1] ("Ver. Cmplt.") ¶¶ 1, 7, 10; Jameson Declaration, December 19, 2005 ("Jameson Dec."), Exhibit ("Exh.") 1, ¶ 2. Since then, Winning Connections has established itself as the pre-eminent voter contact and grassroots advocacy firm for Democratic campaigns, winning numerous prestigious awards and earning a sterling reputation. Ver. Cmplt. ¶¶ 7, 9. These accomplishments are due in large part to the unique method of contacting voters, including proprietary techniques, a confidential and proprietary database called the WCI System (WCI stands for Winning Connections, Inc.), and a distinct strategy, developed by Mr. Jameson and the Winning Connections staff and other personnel. Ver. Cmplt. ¶ 8, 22. Winning Connections relies heavily on its past achievements and impressive reputation developed over the years to market itself and compete successfully in this niche market. Ver. Cmplt. ¶ 9, 11; Jameson Dec. ¶ 4. Important given the fact that it is now mid-December, because of the unique nature of the business, the months just after any election day are critical to the vitality of the company, as clients normally retain Winning Connections during this relatively short window to assist in the upcoming election cycle. Ver. Cmplt. ¶ 11.

Defendant Brad Chism and Winning Connections

In 2000, Mr. Jameson hired Defendant Brad Chism, a friend for 20 years and a college classmate, to work for Winning Connections. Ver. Cmplt. ¶ 12. Although prior to his hire Defendant Chism had no experience in running or managing telephone voter contact programs, Jameson Dec. ¶ 2, over the years Defendant Chism was promoted to Vice President for Policy Campaigns, through which he was privy to Winning Connections' confidential and proprietary database of current and potential customers, financial, cost and profitability information, and confidential marketing information and strategies. Given the small size of the company, it was

---

[1] Given the shortness of time, and in lieu of submitting a repetitive Declaration, Plaintiff Winning Connections files with this Motion a Verified Complaint, as verified by Mr. John Jameson. To the extent the Verified Complaint does not include all the facts germane to this Motion, Mr. Jameson has also submitted a separate Declaration to supplement the Verified Complaint with additional information.

understood by Defendant Chism, as well as all senior management, that such information was not to be disclosed to any third parties, and to the best of the company's knowledge, until the matters at issue, Defendant Chism kept that information confidential.  Ver. Cmplt. ¶ 13.

By virtue of his position at Winning Connections, Defendant Chism attended numerous important client-prospecting meetings.  Mr. Jameson personally introduced Defendant Chism to Mr. Jameson's business colleagues, and to Winning Connections' clients and potential clients, and brought him to multiple meetings over the September-November 2005 period. Ver. Cmplt. ¶ 14. Defendant Chism also was included in many aspects of the company's marketing and project implementation efforts.  *Id*  Through his work, Defendant Chism had access to, and continuously used, the company's proprietary database of potential clients, including names, addresses, other contact and personal information, and either notes about possible business opportunities that each potential customer presented or the actual amount of business that the existing customer had previously undertaken.  Ver. Cmplt. ¶ 14.

In October 2005, Mr. Jameson arranged for Defendant Chism to set up several significant client prospecting meetings, including a meeting with a significant statewide campaign in State Party "A".[2]  Ver. Cmplt. ¶ 16.  After that meeting, Mr. Jameson and Defendant Chism had extensive discussions about ways that Winning Connections could retain Statewide Campaign A as a client. Ver. Cmplt. ¶ 16.  By agreement between the company and Defendant Chism, Defendant Chism was to be, and was, paid for his services through the end of November 2005, and thus maintained a duty of loyalty to Winning Connections throughout this period.  Ver. Cmplt. ¶ 15.

---

[2] Winning Connections will disclose in greater detail the specifics of these client meetings and the identities of all parties described herein, upon entry of an appropriate Protective Order ensuring their confidentiality.  *See* D.C. Code § 36-405 (Under the D.C. Trade Secrets Act, a court shall preserve the secrecy of trade secrets by reasonable means, which may include a protective order.). Plaintiff has, however, identified all parties and actions with sufficient specificity to allow Defendant Chism to identify each described event.

Defendant Chism also cultivated, and brought in as a Winning Connections' client, a gubernatorial candidate in Florida for a telephone voter contact program. Jameson Dec. ¶ 14. And when Mr. Jameson asked if the conversations with that candidate meant that Winning Connections should discontinue conversations with the other candidate in the race, Defendant Chism said "yes." However, at the same time that Defendant Chism was talking to that client on behalf of Winning Connections, he was also talking to the client on behalf of his new, directly competitive venture. *Id* It now appears that the client is working with Defendants, who claim to have already run a telephone program for that client. *Id.; see also* Ver. Cmplt. Exh. 9 at 2 (Defendants' marketing material dated December 2005 stating "By the time you get this document, we will have completed a calling program for a candidate in a 2006 statewide race in Florida and started a local government ballot measure calling project").

Defendant Chad Gosselink and Winning Connections

In or about 1998, Mr. Jameson hired Defendant Chad Gosselink, a prior acquaintance, to work for Winning Connections. Ver. Cmplt. ¶ 18. Like Defendant Chism, while prior to his hire Defendant Gosselink had no experience in running or managing telephone voter contact programs, Jameson Dec. ¶ 2, he was quickly promoted to Vice President of Operations, through which he too had access to the same Winning Connections' confidential and proprietary information identified above, was taken to many client and prospective client meetings, and was included in many aspects of the company's operational and project implementation efforts. Ver. Cmplt. ¶ 19.

September 2005 – The Conspiracy To Steal Winning Connections' Confidential Business And Create Their Own Business

Beginning no later than September 2005, Defendants began working to steal Winning Connections' trade secrets and other confidential and proprietary business information and misappropriate it for their own new business. Ver. Cmplt. ¶ 22; Ver. Cmplt. Exh. 1. In an email dated September 20, 2005, Defendant Chism outlined how he proposed to download information

6

from Winning Connections' proprietary and unique WCI System.  Ver. Cmplt. ¶ 22; Ver. Cmplt.

Exh. 1.  The email states:

> talked to two corporate lawyers who say our exposure is twofold: 1. if we take
> propriety, trademarked or patented systems.  There is nothing in WCI like that so we
> are alright.  2. If we try to break a contract between WC and a client.  Again, there
> are no signed contracts with clients til the last week or so.  It gets a little fuzzy after
> that....
> What we need to do is download the contacts we want--only those that are public
> infornmation [sic] from other sources--and then use a standard outlook format for
> them now.  The big thing to avoid is leaving on one day and then at 5 p.m. the same
> day batch emailing to the entire WCI database.  That's borderline legality but it's a
> slap in the face and is likely to generator ill will when we leave
>
> -- i think we need to try to hang on thru November elections.  We either need to
> leave this week--and only after we land a $X00,000 project and convince them to go
> with us, or wait as long as we can in 05, giving WC good service til the day we walk
> out.

*Id* (emphasis added).  Not surprising in light of his later actions, Defendant Chism mischaracterized

the WCI system, a highly proprietary database system uniquely constructed by, and for, Winning

Connections, which contains significant "non-public" information, including financial information.

Ver. Cmplt. ¶ 22; Jameson Dec. ¶ 4-5.  In fact, the computer systems contain names uniquely

collected by Winning Connections, and that are not generally known to be important contacts for

the voter and advocacy outreach industry.  Jameson Dec. ¶ 5 (describing how certain key client

names are not generally known outside the business).  Defendant Chism, however, not only

downloaded the contacts, but delivered on his goal of stealing Winning Connections' clients – the

very clients to whom he and Mr. Jameson were talking on behalf of Winning Connections.  Ver.

Cmplt. ¶ 22; Jameson Dec. ¶ 14.

October through early December 2005 – Defendants Chism and Gosselink Engage in Significant
Document and Technology Theft

Through October and November 2005, Defendants engaged in a systemic and routine theft

of dozens of Winning Connections' documents and the destruction of over 500 computer files.  Ver.

Cmplt. ¶ 23.  For example, on October 26, 2005, Defendant Chism sent an email to Defendant Gosselink, noting:

> there are several Winning Connections documents that we may want to think about modifying to fit out needs.  I think we need to avoid an outright copy of the format of the existing documents to minimize headaches from John [Jameson] as well as to ensure that clients don't think we are Winning Connections Lite.

Ver. Cmplt. Exh. 4.  Defendants also discussed how many client files they wanted to take from the Winning Connections system.  *Id.*  Defendant Chism's emails to others reveal his carefully constructed plans to misappropriate existing Winning Connections documents, including the changes he wanted to make on the Winning Connections documents that he was misappropriating and converting for his own use.

Within days, Defendant Chism was emailing Winning Connections' most sensitive and confidential documents – including customer data and financial information, report format documents, and numerous other documents constituting the lifeblood of the company – from his office computer to his multiple personal email accounts.  Ver. Cmplt. ¶ 24-28; *see* Ver. Cmplt. Exhs. 2-4.  While Plaintiff has been able to recover only fragments of the data, it has already retrieved (although not in original form) at least one spreadsheet of Winning Connections' client contacts that Defendant Chism emailed from his Winning Connections' laptop to his private email account.  *See* Declaration of Thomas McKnight ("McKnight Dec."), Exh. 2, ¶ 5; McKnight Dec. Exh. B.  The data includes not only names, but specific and proprietary notations, a specific identification of "2006 Races: Targets," and a ranking of "$$ Potential."  McKnight Dec. Exh. B.

Defendants also conspired to steal the very core of Winning Connections' data management system – the WCI System – a confidential and proprietary system created by Winning Connections through years of work and financial investment and essential to the company's past, current and future success.  Ver. Cmplt. ¶ 25.  In frank email exchanges, Defendant Chism communicated with Wining Connections' computer specialist, Mr. Ilro Lee, regarding "[h]ow big is the database of the

contact you will have in our contats [sic] folder... ", Ver. Cmplt. Exh. 4, referring to the WCI

contacts system and the client contacts list that Defendant Chism was in the process of taking from

Winning Connections.[3]  Later, on November 23, 2005, Mr. Lee emailed Defendant Chism, stating:

> Have you thought about when the best time would be for me to leave? Chad and
> I agreed that let chad announce his departure first and I fade out later, by
> saying I want to concentrate on school and Chad is going to pay me a shit
> load of money to build WCI contacts and Ops. Allison also agreed. Let me
> know.

Ver. Cmplt. Exh. 8.  As explained in the Jameson Declaration, the WCI system is a proprietary

computer system custom built for Winning Connections to help manage client contact information,

including personal and professional information. Jameson Dec. ¶ 4.  The WCI System is maintained

in a password-protected file available only to Winning Connections' employees, associates and

consultants. *Id.*  It is the very type of unique, distinct and confidential business information that is

classically defined as a trade secret.

<u>Defendants Try To Cover Their Tracks</u>

Knowing that they were improperly taking corporate information, Defendants took several

extraordinary steps to try conceal their actions.  Beginning on November 2, 2005 and lasting

through at least December 6, 2005, Defendant Chism undertook a massive purge of documents off

his Winning Connections laptop, including using a highly unusual "registry erasing" technology, to

try hide his wrongful activity from Winning Connections.  McKnight Dec. ¶ 3.  Defendant Chism

also deleted and erasing 540 individual files off his hard-drive. *Id.* ; Ver. Cmplt. ¶ 36.  There was no

legitimate business purpose for him erasing company files off a company computer.  However,

---

[3] In addition, Defendants callously conspired to take Winning Connections' corporate opportunities,
in at least one instance, involving the work of a graphic design firm for a new marketing campaign.
Ver. Cmplt. ¶ 29.  Even at this preliminary stage, the email exchanges among Defendants
demonstrate that their actions were premeditated and calculated to misappropriate every last
business opportunity the company had to offer.  Ver. Cmplt. ¶ 30.

given his use of the registry-cleaning program, Winning Connections cannot recreate the documents he took (although it expects to receive copies in discovery).

<u>November 2005 – Defendants Falsely and Knowingly Misrepresent to Winning Connections their Decisions to Leave and Conspire with Others to Misrepresent Certain Events</u>

On November 5, 2005, Defendant Chism finally notified Winning Connections that he was planning on leaving. Rather than being honest, and given that he was knee-deep in creating the new direct competitor using Winning Connections' proprietary data and systems, he knowingly and falsely told Mr. Jameson that he was leaving to become a "GC" – a General Consultant to political campaigns. Ver. Cmplt. ¶ 31. Ironically, and believing Defendant's representation, Mr. Jameson responded by offering Defendant Chism part-time or consulting work and even referred some consulting work to him. Ver. Cmplt. ¶ 31. Defendant Chism never told Mr. Jameson his real intent, and instead Mr. Jameson began to learn about Defendant's actions when, in early December, his clients called about a cocktail party to which they had been invited by Mr. Chism. Ver. Cmplt. ¶ 37 (that many thought was a Winning Connections party!).

Defendant Gosselink also lied to Winning Connections about his departure when he notified Mr. Jameson on November 29, 2005 that he had been "offered" a new position with Defendant Chism's new company, Defendant Corporate John Doe 1, even though he had been conspiring for months with Defendant Chism to steal Winning Connections' proprietary and confidential information and compete directly. Ver. Cmplt. ¶ 33; Ver. Cmplt. Exh. 6. More remarkable was Mr. Gosselink's fatuous claim that <u>"I still have loyalty to not only you, but the company that I've grown to be part of</u> and I would be willing to offer help in transitioning myself out and someone else into the position." Ver. Cmplt. Exh. 6. The offer, in hindsight, was obviously one to steal more corporate secrets.

Both Defendant Chism and Defendant Gosselink also worked to steal other Winning Connections employees, including Mr. Ilro Lee, and assisted him in fabricating stories to conceal

their true intentions. Ver. Cmplt. ¶ 34, Ver. Cmplt. Exhs. 7, 8. In more candid email exchanges, Mr. Lee wrote:

> Did you guys had the chance to read what I sent you about how we structure the company to give me incentives to work new products and build the new ops and WCI contacts in timely manner?
> Well, <u>as soon as I get the nod from you two</u> I want to quit the firm. I thought about how we go about doing this, and I couldn't come up with a better way. <u>I want to go to John and say I have lost my inner desire to work and I need to have a significant change in life. Also want to concentrate on school.</u>
> Please let me know on your thoughts.

Ver. Cmplt. Exh. 7 (underline added); see also Ver. Cmplt. Exh. 8 (similar email). Defendants' own words, pieced together by Winning Connections over the last few weeks, prove Defendants' theft of company property and clients and their attempted cover-up.

<u>November and December 2005 - Defendants Pursue Direct Competition with Winning Connections, Blatantly Misrepresenting their New Business Venture to Third Parties</u>

Following the November elections, Winning Connections' next major marketing opportunity was the December 1-3, 2005 Democratic National Committee meeting in Phoenix, Arizona. Ver. Cmplt. ¶ 37. While still employed by Winning Connections, Defendant Chism contacted a senior official at the Association of State Democratic Chairs to arrange a cocktail reception at that DNC event. Rather than disclose that he was planning the reception on behalf of his new company, he misrepresented that it would be a Winning Connections event. Ver. Cmplt. ¶ 37. Similarly, Defendant Chism misrepresented to attendees of the reception, including numerous Winning Connections' corporate clients and prospects, that the reception was to be hosted by Winning Connections, and consequently, those persons attended under false pretenses. Ver. Cmplt. ¶ 38.

In the days that followed, Defendants also circulated emails and other announcements containing false information about the new business venture. Ver. Cmplt. ¶ 39. For example, on December 7, 2005, Defendant Chism circulated an email (apparently to Winning Connections

existing and prospective clients) announcing that he and Defendant Gosselink were forming a new – unidentified -- voter contact firm.  Ver. Cmplt. ¶ 39; Ver. Cmplt. Exh. 9.  That email contained false and misleading statements in which Gosselink claimed credit for Winning Connections' achievements.  Ver. Cmplt. ¶ 39.  Attached to the email, Ver. Cmplt. Exh. 9, was a description of their new (and oddly unidentified) business, also containing false and misleading information.  Ver. Cmplt. ¶ 40; Ver. Cmplt. Exh. 9.  For example, Defendants claimed to have won 10 of the 13 "Pollie" awards that had Winning Connections had earned the prior year, when in fact Defendants did not win the awards, and, even more brazen, in some instances did not even manage the programs.  Ver. Cmplt. ¶ 40.  Additionally, Defendant Chism falsely attributes to himself the successes of the Winning Connections team, including, among others, Mr. Jameson.  Ver. Cmplt. ¶ 41.

After stealing Winning Connections' trade secrets and other confidential and proprietary business information, improperly contacting Winning Connections' existing and prospective clients, misrepresenting marketing materials, and falsely claiming credit for the work of Winning Connections, Defendants began improperly soliciting Winning Connections' key employees.  Ver. Cmplt. ¶ 42.  Specifically, Defendant Chism, on behalf of himself and Corporate John Doe 1, persuaded Defendant Gosselink to leave Winning Connections and join the new firm.  Ver. Cmplt. ¶ 43.  Defendant Chism also worked with Winning Connections' Chief Information Officer, Mr. Ilro Lee, trying to persuade him to resign from the firm.  Ver. Cmplt. ¶ 43.  Moreover, given the timing of the solicitation – just as Winning Connections was gearing up for the 2006 election cycle – and the fact that Winning Connections only consists of approximately a dozen employees, Defendants' actions were particularly harmful and resulted in the intentional interference with ongoing and prospective business relationships.  Ver. Cmplt. ¶¶ 42, 43.

Summary

Taken together, Defendants' conduct represents a coordinated and premeditated plan to steal Winning Connections' confidential business information, trade secrets, and employees, and harm the business. Any one of these actions alone would be sufficient to harm Winning Connections, and support injunctive relief and damages before this Court; taken together, Defendants' activity over the past eight weeks transcends even the most extreme competition that former officers of a corporation are allowed to engage in when leaving their former employer. Defendants have used, and will inevitably continue to use, Winning Connections' confidential and proprietary information. Further, Defendants have already distributed to third parties false and misleading information about their new business to the harm and detriment of Winning Connections. Thus, immediate and ongoing relief from this Court, as well as an eventual award of damages, are necessary to end Defendants' unlawful conduct and to restore Winning Connections to the business advantage to which it is entitled but for Defendants' improper and illegal conduct.

## III. ARGUMENT

### A. Plaintiff Has Satisfied the Standard for Preliminary Injunction

To prevail on an application for a preliminary injunction, a movant must demonstrate that: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) (quoting *Davenport v. Int'l Bd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). No one factor is necessarily dispositive in determining whether injunctive relief is warranted; rather, "the factors interrelate on a sliding scale and must be balanced against each other." *Id.* (quoting *Davenport*, 166 F.3d at 361). A particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *Id.* (citing *Serono Labs. v.*

*Shalala*, 158 F. Supp. 1313, 1318 (D.C. Cir. 1998)).  However, a "strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors." *Id.*

Importantly, the Lanham Act specifically permits injunctions in order to end continuing violations and prevent future violations.  15 U.S.C. § 116(a).  Similarly, the District's Trade Secrets Act authorizes imposition of an injunction for such time as necessary "to eliminate commercial or other advantage that otherwise would be derived from the misappropriation" and allows courts to order appropriate affirmative acts to protect trade secrets.  D.C. Code § 36-402.

As set forth below, Plaintiff Winning Connections is likely to succeed on the merits of each of its claims and will suffer irreparable harm for which there is no adequate remedy at law without the injunctive relief it requests.  In similar cases the courts of this jurisdiction have routinely granted injunctive relief where defendants have taken confidential documents from their former employers for use at a competitor, claimed a former employer's successes at their own, and solicited clients of the former employers using their former employer's confidential information.  *Morgan Stanley*, 150 F. Supp. 2d at 80-81 (granting a motion for a temporary restraining order where plaintiff took confidential files upon resignation, including client lists, and solicited his former employer's clients); *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1271-72 (D.D.C. 1997) (granting injunctive relief against former chairman and CEO who set up new investment management company while still employed by plaintiff and later falsely represented his former employer's performance record as that of the new company).  Plaintiff's Emergency Motion for Preliminary Injunction should be granted.

### B. Plaintiff Has a Strong Likelihood of Success on the Merits of its Claims

#### 1. Lanham Act (Count I)

Winning Connections has a strong likelihood of succeeding on its Lanham Act claim. The statute[4] "creates liability for false or misleading statements made in 'commercial advertising or promotion.'" *Riggs, supra,* 966 F. Supp. at 1264 (citing 15 U.S.C. § 1125(a)(1)(B)); *see* **Error! Bookmark not defined.***also Gordon & Breach Science***Error! Bookmark not defined.** *Publishers S.A. v Am Inst. of Physics,* 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994). To prove a violation of the Lanham Act, a plaintiff must demonstrate that the defendant's advertising is: (1) false and misleading; (2) actually or likely deceptive; (3) material in its effect on buying decisions; (4) connected with interstate commerce; and (5) actually or likely injurious to the plaintiff. *Id.* at 1267 (citing **Error! Bookmark not defined.***ALPO Petfoods, Inc. v Ralston Purina Co.,* 913 F.2d 958, 964 (D.C. Cir. 1990)). The most relevant case in this jurisdiction is *Riggs,* in which Judge Lamberth found defendants' marketing materials to violate the Act where they gave clients the impression that their new company was no different from the defendants' previous employer violated the Lanham Act.

Riggs Investment Management Corporation ("RIMCO"), sued its former chairman of the board and CEO when he began forming a competitive business while still employed by RIMCO,

---

[4] The relevant section of the Lanham Act, 15 U.S.C. § 1125(a) governing civil actions for false descriptions provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

shared RIMCO's confidential information with his business partners in developing the new company, solicited RIMCO employees and clients, and then promoted the new business by claiming RIMCO's performance history as that of the new business. 966 F. Supp. at 1253-64. Specifically, the new investment management company, Columbia Partners, disseminated RIMCO's performance record and described it, at different times, as the former CEO's equity performance record while at RIMCO and, at other times, as Columbia Partners' record. *Id* at 1258. Columbia Partners falsely claimed in its advertising that the group responsible for the successful performance record had left RIMCO and joined Columbia Partners, failing to properly credit key persons who worked at RIMCO but did not join the new company. *Id.* at 1258-60. In analyzing the statements, Judge Lamberth found that: (1) Columbia Partners clearly advertised in a misleading manner, *Id* at 1267-68; (2) Columbia Partners' advertising was actually false, *Id* at 1268-69; (3) the advertising was material in effect as a performance history is "a prerequisite to an investment manager receiving a recommendation," *Id* at 1269; (4) the commerce was interstate, *Id*; and (5) because Columbia Partners acted willfully and in bad faith with respect to its advertising, the plaintiffs need not show actual damages and could receive damages equal to the defendant's profits, *Id* at 1269-71. Moreover, the court ordered injunctive relief, as authorized under the Lanham Act, 15 U.S.C. § 1116(a), to protect RIMCO from loss of business and goodwill and to prevent the defendants from profiting from RIMCO's record. *Id* at 1273-74.[5]

The facts here essentially mirror those in *Riggs*, except that these Defendants have failed to make any attempts to counter the ongoing false and misleading advertising, thus warranting the injunctive relief sought by Winning Connections. Like the defendants in *Riggs*, Defendants Chism

---

[5] Because the defendants in *Riggs* had already taken steps to correct the misleading advertising and implemented revised guidelines for presentations, the court more narrowly tailored the injunction than what was requested by the plaintiffs. *Id* at 1274.

and Gosselink widely issued promotional materials, including emails and flyers, and other statements whereby they held out in a false and misleading manner the achievements of Winning Connections as that of their new business, Corporate John Doe 1. *See* Ver. Cmplt. Exh. 9.

For example, on December 7, 2005, Defendant Chism circulated an email to certain Winning Connections clients and client prospects announcing the new business, and claiming that Defendant Gosselink, while at Winning Connections, had, "ran the call centers, oversaw the databases and directed the other aspects of the 'back office' that made Winning Connections a top tier firm. Together, we will offer the experience of more than 1300 telephone voter contact programs in 48 states as we serve clients in this new firm." Ver. Cmplt. Exh. 9 at 2. The truth, however, is that other Winning Connections' personnel had also been involved in running the call centers, overseeing the databases, and running the "other aspects of the back office," and Mr. Jameson, not Defendant Chism, along with the Winning Connections' staff, were all involved in engineering and running many of the programs. Ver. Cmplt. ¶ 39.

Similarly, the one-page description of the new business, widely circulated across the country by Defendants through email falsely claimed:

### Do you have the experience to get the job done?

Since 1998 Chad managed call center logistics for more than 1300 calling programs in 48 states for Winning Connections. We've added operations staff that were part of our team last year during the final month of the election cycle-- the system we built tracked more than one hundred fifty calling programs making six million calls across the country. And this year alone, Brad has aided clients in 27 states, ranging in size from legislative special elections to statewide ballot measures.

### What about work quality?

Of the 13 AAPC award for excellence Winning Connections won in 2005, Brad developed and managed 10 of these programs. The previous year, Brad's calling programs won 8 awards for excellence at the AAPC.

Ver. Cmplt. Exh. 9. Unfortunately, the "system" of which the new Joe Doe 1 entity was claiming as its own ("our team last year") which "tracked more than one hundred fifty calling programs making six million calls" belonged to Winning Connections[6] -- not to Defendants – and was built through the work of many other company employees and consultants. Ver. Cmplt. ¶ 40.

Similarly, Defendant Chism ("Brad") did not develop or manage each of the 10 (of the 13) programs which received AAPC "Pollie" awards for which he took sole credit in his marketing materials. Ver. Cmplt. ¶ 41. Rather, these programs were developed and managed by several on the Winning Connections team, including its CEO and President, John Jameson, and other Winning Connections staff. *Id.* While Defendant Chism had some involvement in several of the programs, there were other programs in which he had no substantive involvement whatsoever. *Id.* His claim of sole responsibility for these award-winning programs was simply false.

Even at this early stage of investigation, it is clear that Defendants' statements and actions have resulted in confusion among Winning Connections' existing and prospective clients and are intended to deceive, so that the Defendants can take advantage of Winning Connections' years of work and impressive track record. Like in *Riggs*, Winning Connections operates in a niche market where its reputation and history of achievement are particularly important to its ability to attract business. Therefore, Defendants' false and misleading advertising would certainly result in extreme harm to Winning Connections, especially in these key months just after the November elections. Winning Connections has demonstrated a likelihood of success on the merits, warranting injunctive relief. Moreover, immediate injunctive relief is crucial to halt the Defendants' continuing outrageous

---

[6] In fact, the system is Winning Connections' operations system -- the very system that Defendants were in the process of stealing from Winning Connections since September 2005.

and wrongful actions in violation of the law and to prevent further substantial and irreparable injury to Winning Connections' business.

       2.  D.C. Trade Secrets Act Claim (Count III)

The District's Trade Secret Act requires injunctive relief and damages against any person who misappropriates a trade secret. D.C. Code § 36-401 *et seq.* In order to prevail on a misappropriate of trade secrets claim, a plaintiff must establish: "(1) existence of a trade secret; (2) acquisition of the trade secret as a result of a confidential relationship; and (3) unauthorized use [or disclosure] of the secret resulting in loss." *Catalyst & Chemical Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 7-8 (D.D.C. 2004) (internal quotations and citations omitted). To establish that a trade secret exists, courts consider whether: (1) the information was secret; (2) the value of the information must derive from the secrecy; and (3) the owner of the trade secret must use reasonable efforts to safeguard the confidentiality of the information. *Id.* at 8. Here, Winning Connections' confidential and proprietary information includes customer lists, proprietary marketing information, prospective business opportunities, existing contracts and prices, revenue and growth information, as well as the WCI System. *See Morgan Stanley, supra*, 150 F. Supp. 2d at 76 (finding customer lists deserving of trade secret status under the Act). Such information, and in particular the WCI System, which constitutes the lifeblood of Winning Connections, is a result of years of hard work and substantial monetary investment. Winning Connections' confidential and proprietary information derives value from its secrecy, especially since the voter contact business is a niche business. Winnings Connections informs its staff about the confidentiality of such information and only shares that information with its own employees – a small group of individuals, mostly friends and family of the founder, Mr. Jameson – and some associates and consultants. Further, the WCI System is password-protected and only available to Winning Connections' employees, associates and consultants.

As evident from the emails quoted above which directly reference theft of the WCI system and Winning Connections' client/prospective client contacts list, Defendants clearly stole trade secret information as a result of their confidential relationship with the company. Further, they have already wrongfully used Winning Connections' trade secret information, and will inevitably disclose further trade secret information, to obtain a competitive advantage over Winning Connections. A preliminary injunction is necessary to prevent further misuse of this information.

Winning Connections, however, also requests an injunction prohibiting Defendants from stealing Mr. Lee from Winning Connections and hiring him to work for their directly competitive business. Mr. Lee is the architect of the WCI system, and can easily recreate it for Defendants if he jumps ship. This Court in these circumstances should thus adopt the "inevitable disclosure" doctrine, and an injunction should issue barring Defendants from hiring Mr. Lee.

The inevitable disclosure doctrine stems from a Seventh Circuit decision, *PepsiCo, Inc. v Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995),[7] in which the Seventh Circuit dealt squarely with the issue of threatened or inevitable misappropriation of trade secrets and other confidential information. There, a softdrink manufacturer brought an action against a competing company and a former managerial employee, Mr. Redmond, seeking to prevent Mr. Redmond from disclosing trade secrets and confidential information in his new job and from assuming duties relating to beverage pricing, marketing, and distribution. *Id.* at 1263. PepsiCo asserted that Mr. Redmond could not help but rely on and consequently reveal PepsiCo's trade secrets in his new position and that the secrets would enable the other manufacturer to achieve a substantial advantage. *Id.* at 1270. The Seventh Circuit was persuaded, based on Mr. Redmond's lack of forthrightness and on occasion

---

[7] Noting the paucity of precedent from the jurisdiction interpreting the District's Trade Secrets Act, the U.S. District Court for the District of Columbia found it appropriate to consider the decisions of other states that had adopted the Uniform Trade Secrets Act when interpreting that Act. *Catalyst & Chem Servs., Inc. v Global Ground Support*, 350 F. Supp. 2d 1, 7 n.3 (D.D.C. 2004).

outright lies between the time he accepted the new position and the time he informed PepsiCo of his resignation, that Mr. Redmond could not be trusted to refrain from disclosing trade secret information. *Id.* at 1270-71. Thus, the court upheld the district court's finding that PepsiCo demonstrated a likelihood of success on the claim of trade secret misappropriation and upheld the grant of injunctive relief.[8] *Id.* at 1271.

*DoubleClick, Inc. v. Henderson,* 1997 WL 731413 (Sup. Ct. N.Y. County 1997), is another decision whose analysis is pertinent here. The court found that DoubleClick demonstrated likely success on its claim of misappropriation of trade secrets where defendants actually misappropriated its confidential information and there was also a high probability of "inevitable disclosure" of trade secrets. *Id.* at *5-6. There, the defendants, top executives at DoubleClick with access to highly sensitive information, made efforts to form a competitive company in a niche market of selling internet advertising while still employed with DoubleClick. *Id.* at *3. Evidence showed that at least one of the defendants had copied numerous confidential, strategic documents, including a business plan, pricing information and customer information, onto his laptop computer for use in developing the competing business. *Id.* at *3-5. The actual misappropriation of confidential information combined with the "defendants' cavalier attitude toward their duties to their former employer" led the court to conclude that defendants were likely to use DoubleClick's confidential information against them, thus demonstrating plaintiff's reasonable likelihood of success on the merits. *Id.* at *6. *See also Merck & Co. Inc. v. Lyon,* 941 F. Supp. 1443, 1460 (M.D.N.C. 1996) (finding that North Carolina would enjoin threatened misappropriation based upon the inevitable disclosure theory;

---

[8] In *PepsiCo, Inc. v. Redmond,* No. 94 C 6838, 1996 WL 3965, *1 (N.D. Ill. Jan. 2, 1996), the district court later entered a permanent injunction in favor of PepsiCo and against Mr. Redmond. In its analysis of the inevitable disclosure doctrine, the court relied in part on the rationale presented by the D.C. Circuit in *FTC v. Exxon Corp.,* 636 F.2d 1336 (D.C. Cir. 1980), that "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so." *Id.* at *19.

"likelihood of disclosure could be shown by the degree of similarity between the employee's former and current position, and the value of the information").[9]

As in *DoubleClick*, Defendants have already obtained vital trade secret information and begun using it to their advantage in their new company. And like in both *PepsiCo* and *DoubleClick*, there is little question that Mr. Lee will have to "inevitably disclose" Winning Connections' trade secret information if immediate injunctive relief is not granted. Jameson Dec. ¶ 11-13. Defendants' pattern of theft, deception and lies, and their coordination of Mr. Lee's lies, proves that they cannot be trusted not to rely on Winning Connections' trade secret information, which would result in substantial loss to Winning Connections. Thus, like in *PepsiCo* and *DoubleClick*, Plaintiff Winning Connections is likely to succeed on the merits of its claim under the District's Trade Secrets Act.

### 3. Misappropriation of Confidential Business Information, Breach of Fiduciary Duty, and Unfair Competition (Counts II, IV, and VII)

Winnings Connections also has a strong likelihood of success on the merits of its claims of misappropriation of confidential business information, breach of fiduciary duty and unfair competition. Even if business information does not rise to the level of a trade secret, employees still have a common law duty of loyalty that prohibits them from using confidential knowledge acquired during their employment to compete with that former employer. *Group Ass'n Plans v. Colquhoun*, 466 F.2d 469, 472-73 (D.C. Cir. 1972). Under D.C. law, "[c]orporate officers and directors owe an undivided and unselfish loyalty to the corporation such that 'there shall be no conflict between duty and self-interest." *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 53 (D.D.C. 2001) (citing *Mercer*, 920

---

[9] Courts in numerous other jurisdictions have granted preliminary injunctions based on the inevitable disclosure doctrine. *See, e.g., Doebler's Pennsylvania Hybrids, Inc. v. Doebler Seeds, LLC*, 88 Fed. Appx. 520 (3d Cir. 2004); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500 (5th Cir. 1982); *Barilla Am., Inc. v. Wright*, No. 4-02-CV-90267, 2002 WL 31165069 (S.D. Iowa July 5, 2002); *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.*, 255 F. Supp. 645 (E.D. Mich. 1966); *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transport Services*, 336 Ark. 143 (Ark. 1999); *Conley v. DSC Cmmc'ns Corp.*, No. 05-98-01051, 1999 WL 89955, *18 (Ct. App. Tex. Feb. 24, 1999).

F. Supp. at 233) (internal quotation marks omitted); *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1264 (D.D.C. 1997) (citing *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 568 (1978)). Moreover, this duty of loyalty does not end, and cannot be summarily renounced, upon termination of the employment relationship. *Group Ass'n Plans*, 466 F.2d at 473.

While an employee can make arrangements to compete with an employer before terminating his employment, he cannot engage in unfair and disloyal acts, including sharing confidential information with a new employer or soliciting employees from the former employer to work for the competitor. *Furash*, 130 F. Supp. 2d at 53 ("In preparing to compete, an employee may not commit wrongful acts, 'such as misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees.") (citing *Mercer*, 920 F. Supp. at 233); *Riggs*, 966 F. Supp. at 1265-66 (same) (citing *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 965 (Del. 1980)). In addition, the fiduciary duty of loyalty also prohibits an employee from usurping a corporate opportunity. *See Robinson v. R&R Publ'g Inc.*, 943 F. Supp. 18, 21-22 (D.D.C. 1996).

The *Riggs* case, discussed above, is particularly instructive on the breach of fiduciary duty claim as well. There, the former Chairman of the Board and CEO of RIMCO shared confidential information with his partner in a new business about wages paid to RIMCO employees and fees paid to RIMCO clients prior to his departure from RIMCO. *Riggs, supra*, 966 F. Supp. at 1265. In addition, the former chairman and CEO solicited RIMCO employees to work at the new company before he resigned from RIMCO. *Id.* Based on these actions, the court found there was "no doubt" that the defendant breached his fiduciary duty of loyalty. *Id.* at 1266; *see also Furash*, 130 F. Supp. 2d at 54 (where, among other alleged violations of the duty of loyalty, the former employee solicited at least one other employee, the evidence might lead a jury to conclude that the activities constituted a breach of fiduciary duty).

Here, the Defendants Chism and Gosselink had access to, *and took,* extensive confidential and proprietary business information while working for Winning Connections, including information regarding Winning Connections' current and prospective clients, contracts, business methods, and actual and prospective pricing, and the WCI System. They also were hard at work attempting to hire away Mr. Lee. As Vice Presidents of Winning Connections, Defendants Chism and Gosselink owed a duty of loyalty to Winning Connections not to use this confidential and proprietary information in their own self-interest and in direct competition against Winning Connections. Clearly, they breached their duty, and misappropriate confidential business information.

> 4. Intentional Interference with Existing and Prospective Contractual Relations (Counts V and VI)

To sustain a claim for intentional interference with existing contractual relationships, a plaintiff must prove: (1) the existence of a contract; (2) defendant's knowledge of the contract; (3) intentional procurement of the contract's breach by the defendant; and (4) resulting damages. *Ulico Cas. Co. v Prof'l Indemnity Agency, Inc.,* C.A. No. 98-1018, 1999 U.S. Dist. LEXIS 8591, *8 (D.D.C. May 5, 1991) (citing *Cooke v Griffiths-Garcia Corp.,* 612 A.2d 1251, 1256 (D.C. 1992)). Winning Connections had numerous existing contracts with multiple clients for various services, of which Defendants were aware. Defendants have intentionally interfered, and will continue to attempt to interfere, with those contracts. Such actions will result in a loss to Winning Connections' earnings and business reputation.

Even for those client prospects, the same result holds true. To sustain a claim for intentional interference with prospective business relationships, a plaintiff must show: "(1) the existence of a business relationship; (2) defendants' knowledge of the business relationship; (3) intentional interference with the relationship by defendants; and resulting damages." *Mercer Mgmt. Consulting, Inc. v Wilde,* 920 F. Supp. 219, 239 (D.D.C. 1996) (citing *Brown v Carr,* 503 A.2d 1241,

1247 (D.C. 1986)).  Moreover, Defendants used wrongful means to establish the competitive

business by misappropriating Winning Connections' confidential business information and trade

secrets.  *Id.* (noting that competitive activity does not itself constitute intentional interference with

prospective business advantage *unless accomplished by wrongful or improper means*).

Winning Connections had numerous existing and prospective clients of which Defendants

were aware.  These include, but are not limited to, the Florida Gubernatorial candidate for which

Defendants have already begun to work – a plain theft of Winning Connections' business

opportunities.  Jameson Dec. ¶ 14.  Defendants intentionally interfered, and will continue to attempt

to, interfere with other Winning Connections' existing and potential clients.  Ver. Cmplt. ¶ 16 (state

party "A" issues).  Moreover, Defendants have taken actions in the name of Winning Connections

to induce breaches of potential contracts, for example by purposefully holding themselves out as

Winning Connections in an attempt to solicit prospective clients of Winning Connections.  Ver.

Cmplt. ¶¶ 37, 38.

    5.   Conversion (Count VIII)

Plaintiff Winning Connections is likely to success on its claim of conversion.  "Conversion is

the unlawful exercise of ownership, dominion, or control over the personal property of another in

denial or repudiation of that person's rights thereto." *Furash, supra*, 130 F. Supp. 2d at 58.  Here,

Plaintiff has made a demand for return, but has yet to see its property. *Id.* ("Where the defendant's

initial possession is lawful, the long-settled rule is that in absence of other facts and circumstances

independently establishing conversion, a demand for return is necessary to show the adverse nature

of the possession.").

After deciding to end his business relationship with Winning Connections, and in derogation

of his responsibilities as a Vice President of the company, Defendant Chism retained corporate

materials, including a laptop computer and associated files.  Both during and after his work for the

company, Defendant Chism used these materials for purposes other than in the interests of Winning Connections, thereby unlawfully exercising ownership, dominion or control over the personal property of another in denial or repudiation of Winning Connections' rights thereto.  Winning Connections formally demanded the immediate return of its property by multiple written communications, the last dated December 12, 2005.  Yet, the documents have not been returned.[10] Before Defendant Chism returned his computer to Winning Connections, he deleted hundreds of computer files.  Winning Connections has been unable to reconstruct the information that was deleted, and Defendant Chism has returned its property.  Defendants possess and are obviously using Winning Connections' information and documents, and have not returned the material to its rightful owner.  Such actions have resulted in damage to Winning Connections.

### C.  Plaintiff Will Be Irreparably Harmed if Injunctive Relief is Not Granted

Plaintiff Winning Connections will suffer irreparable harm if injunctive relief is not granted. Defendants are attempting to establish a new company that would be in direct competition with Plaintiff Winning Connections.  Because the business is a niche market and because of the extreme importance of the next couple months in developing business, allowing Defendants to continue use of information and key technology stolen from Winning Connections would cause Plaintiff to suffer incalculable damages. *Morgan Stanley*, 150 F. Supp. 2d at 77 (finding the argument that Morgan Stanley would be unable to determine the number of clients "pirated away" by the defendant nor the amount of commissions that the clients would generate in the future persuasive for showing irreparable harm; customer list is the "lifeblood" of Morgan Stanley's business).

In addition to the loss of an indeterminable number of clients and profits, Winning Connections will also suffer irreparable injury due to the loss of customer trust and goodwill.

---

[10] Defendant Chism sent an email response on December 13 stating: "some time ago i returned to winning connections a blackberry and laptop computer. i have confirmation that it was received." He has not, however, returned any misappropriated documents.

*Morgan Stanley*, 150 F. Supp. 2d at 77 (finding the argument that Morgan Stanley clients expect that their financial information will be kept confidential persuasive for showing irreparable harm); *Riggs*, 966 F. Supp at 1273 (in deciding to enter injunctive relief under the Lanham Act, the court considered as harm to the plaintiff the loss of business and goodwill). Moreover, the threat of misappropriation on the grounds that Defendants Chism and Gosselink will be unable to assume positions within their new company without inevitably disclosing Winning Connections' trade secrets and confidential information justifies injunctive relief. *PepsiCo*, 54 F.3d at 1272; *DoubleClick, Inc. v. Henderson*, 1997 WL 731413, at *5-6; *Riggs*, 966 F. Supp. at 1273-74 (noting that there was really no means of preventing defendant from profiting from plaintiff's record without injunctive relief because "the court is simply not convinced that Columbia Partners will behave if left unsupervised").[11] Winning Connections will suffer irreparable harm without injunctive relief against Defendants.

### D. Defendants Will Not Be Substantially Injured By Injunctive Relief

Plaintiff Winning Connections does not seek to prevent Defendants from doing business; however, it merely seeks to protect the information, technology, and customer contacts it has worked so hard to develop and obtain from Defendants misuse. Surely, there are a plethora of new political candidates and grassroots organizations with which Defendants can undertake their new business, and Winning Connections does not seek to foreclose those business opportunities. Winning Connections merely asks to maintain the status quo so that Defendants cannot unfairly use to their advantage the years of work and financial investment that Winning Connections made to

---

[11] To demonstrate irreparable harm, "plaintiffs need not establish that the information was actually used, but need only show that the use and disclosure of an employer's protected confidential information is *likely* to occur." *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 125 (E.D.N.Y. 1997).

establish itself, build a strong reputation, develop existing clients, and strive to bring on new prospective clients.

### E.  <u>Granting Injunctive Relief Serves the Public Interest</u>

In this case, granting injunctive relief serves the public interest by preventing false and misleading advertising as contemplated by the Lanham Act, and protecting confidential business information and trade secrets information as contemplated by the D.C. Trade Secrets Act. Additionally, "the public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of ... records." *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 79 (D.D.C. 2001).

### IV. CONCLUSION

For all the foregoing reasons, Plaintiff Winning Connections respectfully requests that this Court grant its Emergency Motion for Preliminary Injunction.  Plaintiff also respectfully requests that the Court set an expedited hearing date on January 3, 2006, or as soon thereafter as is convenient to the Court, to consider this matter and require Defendants to respond to expedited paper discovery requests no later than December 27, 2005,and deposition as notice for December 28 and 29, 2005.

Dated:  December 19, 2005

Respectfully submitted,

David J. Farber (415899)
Susan E. Baldwin (477241)
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C.  20037
(Tel) 202-457-6000
(Fax) 202-457-6315
dfarber@pattonboggs.com
sbaldwin@pattonboggs.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Expedited Motion for Preliminary Injunction, memorandum In Support Thereof, and attached Declarations was served via email, hand and Federal Express, postage prepaid, this 19th day of December, 2005 to the following.

Defendant Brad Chism (via email to: brad.chism@gmail.com; bchism@jam.rr.com; wbcms1960@yahoo.com)
1200 G Street, N.W.   (by hand and Federal Express)
Suite 800
Washington, D.C.  20005
and
221 Westfield Road     (by Federal Express only)
Ridgeland, MS  39157

Defendant Chad Gosselink (via email to: chad.gosselink@yahoo.com)
1200 G Street, N.W.   (by hand and Federal Express)
Suite 800
Washington, D.C.  20005
and
423 1st Street, S.E.     (by Federal Express only)
Washington, D.C.  20003


Susan E Baldwin