UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Winning Connections, Inc. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No.: 1:05-cv-02397 (GK) |
| William Bradford Chism, Chad Gosselink and | ) |
| Corporate John Doe 1 | ) |
| | ) |
| Defendants. | ) |
| | ) |

**OPPOSITION OF DEFENDANT CHAD GOSSELINK
TO PLAINTIFF'S MOTION FOR EXPEDITED PRELIMINARY INJUNCTION**

This Opposition has been prepared and submitted to assist the Court with the issues to be discussed at the telephone status conference to be held on December 29, 2005.  Should the Court schedule a hearing on the Plaintiff's request for a preliminary injunction, Mr. Gosselink intends to present more complete written arguments at that time.

This is a transparent case of legal bullying in which the Plaintiff's breathless efforts to expedite the proceedings is a material tool.  The Plaintiff, Winning Connections, Inc. ("WCI"), seeks to overwhelm Mr. Gosselink and his business partner, Brad Chism.  These individuals have limited resources and have just commenced a fledgling business.  But this business is apparently so threatening to WCI that it seeks injunctive relief that would prevent Messrs. Gosselink and Chism from competing at all.  Yet neither individual defendant is a party to a non-competition agreement or any other agreement that would limit their ability as competitors from soliciting clients or employees of WCI.  Without a contractual basis for preventing this competition, WCI

alleges "theft" of trade secrets, misuse of confidential information and breaches of the defendants' common law duty of loyalty.

WCI does not seek a temporary restraining order because it has woefully insufficient evidence of immediate and irreparable harm. Instead, it seeks a preliminary injunction and requests expedited discovery to determine <u>whether</u> there is evidence of such harm. Expediting discovery would put a tremendous burden on Mr. Gosselink and is completely unnecessary to protect the plaintiff. Mr. Gosselink opposes expediting any of the discovery or the preliminary injunction hearing because the Plaintiff cannot show either irreparable harm arising from the competition by the Defendants or a likelihood of success on the merits. As we will argue, there is no reason to remove this matter from the regular schedule appropriate for other civil matters.

### A. Statement Of Facts

WCI is a small provider of services such as voter telephone surveys to political campaigns, political action committees and other organizations interested in grass roots organizing. (Gosselink Decl., ¶ 2). Chad Gosselink began employment at WCI in 1998 and rose to the position of Vice President For Operations. In that position, Mr. Gosselink designed the original system that served as the foundation for the current database system in use at WCI to track the status of the various projects referred to as the "Operations" or "Ops" system. This system was fully functional on November 30, 2005, when he resigned from WCI. (Gosselink Decl., ¶ 3). He also managed the relationship between WCI and the telephone survey companies who were retained by WCI to make the actual telephone contact with voters. Altogether, he was responsible for managing call center logistics for well over 1000 calling programs for hundreds of clients. (Gosselink Decl., ¶ 4). Mr. Gosselink was nominated by WCI for *Campaigns*

2

*and Elections* magazine's award called "Rising Stars." (Gosselink Decl., ¶ 5). The nomination form states that "Chad oversaw a network of large telephone call centers all over the country and managed millions of calls." (Gosselink Decl., Ex. 1). Mr. Gosselink was never subject to any employment contract or other restrictive convenant that restricted his ability to compete with WCI after he departed or that restricted his ability to solicit customers of WCI or potential customers whose identities he learned while working for Winning Connections. (Gosselink Decl., ¶ 9).

While employed by WCI, Mr. Gosselink and two fellow employees, Brad Chism and Ilro Lee, sought an equity share in the business from the sole owner, John Jameson. (Gosselink Decl., ¶ 10). The equity offer made by Mr. Jameson was inadequate, leading the three to discuss forming their own business. (Id.; Lee Decl., ¶ 6). This ultimately led to the resignation of all three from WCI between early November and mid-December 2005. (Id.). The three now operate a de facto partnership called Zata-3, which seeks to provide services similar to those provided by WCI. (Gosselink Decl., ¶ 10). Neither Chism nor Lee had employment contracts or were subject to restrictive covenants with WCI either. (Gosselink Decl., ¶ 9).

Ilro Lee functioned as WCI's chief information officer and financial officer. In his position, Mr. Lee created the system known as "WCI Contacts." (Lee Decl., ¶ 3). To do this, Mr. Lee merely modified the contact view of the Microsoft Outlook program owned by WCI to permit users to customize, search and store the data recorded about the contacts in a way more convenient for them. He learned how to make this modification from the Microsoft Outlook programming handbook and searching for programming tips on Google. (Id.). There is nothing proprietary to WCI about this contacts management

3

system -- any company or individual owning a copy Microsoft Outlook can perform the same modifications. (Id.). Upon his resignation, the WCI Contacts system was fully functional. (Lee Decl., ¶ 5).

There was no password that was required to access WCI Contacts beyond that required to log onto the computer network. (Gosselink Decl., ¶ 7; Lee Decl., ¶ 4). Thus each WCI employee, regardless of level, had equal access to WCI Contacts. Any employee could also access the password information of any other employee to log onto the network as someone else. All employee passwords were listed in Mr. Lee's contact information in Microsoft Outlook. (Lee Decl., ¶4). The passwords also followed a standard naming convention so that other employees could determine others' passwords and use them when necessary in order to find information or send emails on their behalf. (Id.).

Winning Connections had no written or oral security policy. (Gosselink Decl., ¶ 7). There was no company policy or guidance with respect to what information the company considered confidential or what information employees could or could not disclose to outsiders. (Id.). The company's computer server was housed in an unlocked room. Employees were not required to log off of their computers when they left their desks for long periods or when they left overnight, and many did not. (Id.). Instead, it was encouraged that employees stay logged on so that other employees could use someone else's computer, if necessary. (Id.). WCI's computers also did not automatically lock or log a user off after a certain amount of inactivity. There was no policy that required employees to clean their desks of any work-related materials when they left the office. (Id.).

Consultants of Winning Connections also had unlimited access to the network and to WCI Contacts. (Gosselink Decl., ¶ 8). WCI had no written contracts with its consultants. Thus, there were no written agreements with consultants restricting access to or disclosure of information from WCI Contacts or any other computer file on the system. (Id.). WCI had one consultant that was an employee of another company called Group Cast. That employee was given full access to the network and WCI Contacts, but was not an employee of WCI. (Id.). WCI paid Group Cast for the employee's work. (Id.).

### B. Argument

**1. The Plaintiff Can Show No Irreparable Harm Under The Lanham Act.** The sole basis for federal jurisdiction is WCI's Lanham Act claim. This claim alleges that Gosselink and Chism engaged in false advertising when they distributed a two-page brochure describing their own experience and the objectives of their new company. This claim is bogus. WCI cannot show irreparable harm under the Lanham Act, or any violation of the Act whatever, because WCI disseminated on its own website virtually the same statements it now calls deceptive. Accordingly, WCI is not entitled to expedited discovery or a preliminary injunction hearing on the claim.

   **a. WCI made statements it now alleges are false.** Among the statements WCI alleges are false is the statement that Mr. Gosselink, "ran the call centers, oversaw the database and directed the other aspects of the 'back office' that made Winning Connections a top tier firm." (Compl. ¶ 39). Yet, WCI's web site stated: "A graduate of Connecticut College, *Chad [Gosselink] trains, coordinates and manages all of the firm's calling centers across the country. In the final week of the 2000 election, Chad managed more than 5,000 callers at more than twenty centers from coast to coast..*" (*WCI web page,* attached as Ex. 1 to the Declaration of Karen Brown (emphasis added)). In light of its own statements, WCI cannot be irreparably harmed by the true statement that "Chad ran the call centers" and "directed aspects of the 'back office.'"

   Likewise, WCI cannot be irreparably harmed by the statement that "Chad managed call center logistics for more than 1300 calling programs in 48 states for Winning Connections." (Compl. ¶ 40). This statement is nearly identical to that contained in a WCI press release featured on the current version of WCI's web site. The press release announced that Mr. Gosselink had been named a "Rising Star" in

6

political consulting by *Campaigns and Elections* magazine.  According to the press release, "[o]ne of the first employees at Winning Connections, [Chad] Gosselink has *created and managed more than 1,000 programs for clients* such as the Democratic National Committee, the Sierra Club, and Blue Cross Blue Shield." (Brown Decl. Ex. 2).  WCI's president, Mr. Jameson, further touted Mr. Gosselink's experience and abilities, stating "Chad had a tremendous understanding of the strategic choices in targeting voters effectively, and at the same time, *he has a sure hand when it comes to managing the myriad details involved in delivering tens or even hundreds of thousands of phone calls in multiple programs that often run simultaneously. . .*" (Id. (emphasis added))*.*

To constitute false advertising, "the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *E.g., Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993); *Johnson & Johnson \* Merck Consumer Pharmaceuticals Co. v . Smithkline Beecham*, 960 F.2d 294, 297 (2d Cir. 1992).  Given WCI's statements, claims at issue here such as "Chad ran the call centers" "managed the call center logistics," "oversaw the databases and directed other aspects of the 'back office," are not misleading, facially or otherwise and will not cause WCI irreparable harm.

WCI claims that Mr. Chism misrepresented that he "developed and managed 10 programs" that won ten industry awards called Pollies.  According to WCI, these programs were "developed and managed by several on the Winning Connections team, including its CEO and president, John Jameson, and other Winning Connections staff." (Compl. ¶ 41).  In a January 2005, press release that WCI prepared and provided to the *Mississippi Business Journal, WCI* stated that "Ridgeland resident and Winning

7

Connection's vice president for policy campaigns Brad Chism managed 10 of the 15 [Pollie] award-winning phone programs for [Winning Connections]. Chism operates the Southern regional office for Winning Connections, located in downtown Jackson." (Brown Decl. Ex. 3). Accordingly, WCI cannot claim that this statement is false or can cause it irreparable injury.

      **b. The statements at issue do not state or imply that Messrs. Gosselink or Chism were solely responsible for anything at WCI.** WCI next asserts that Messrs. Gosselink and Chism failed to acknowledge others who had contributed to their accomplishments and the accomplishments of WCI. (Compl. ¶¶ 40-41). Such acknowledgement is unnecessary because Messrs. Gosselink and Chism do not say or imply they were solely responsible for anything. Messrs. Gosselink and Chism sent the email and attachment at issue to sophisticated purchasers of polling services. This audience would naturally understand that Messrs. Gosselink and Chism could not create and perform all functions associated with every program, just as they understand that Messrs. Gosselink and Chism personally do not make millions of telephone calls to voters. *See Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir.1990) (explaining that context is important in discerning the message conveyed, particularly if the target of the advertising is a well informed and sophisticated audience); . Indeed, when WCI said that Mr. Gosselink "trains, manages and coordinates all call programs around the country" or "created and managed more than 1,000 programs for clients," it did not mention the contributions of other consultants and WCI employees. This is because given the context and audience, such an

acknowledgement is unnecessary. Accordingly, the statements at issue are not impliedly false and will not cause WCI irreparable harm.

**2. The Plaintiff Can Show No Irreparable Harm Under the D.C. Uniform Trade Secrets Act.** The plaintiff can show no irreparable harm under the D.C. Uniform Trade Secrets Act because neither its "WCI System" nor the information stored on it is a trade secret. The WCI System is in fact WCI Contacts, a simple modification of the well known Microsoft Outlook program. In order to be a trade secret, the information in this contact database must

> (a) derive actual or potential independent economic value, from not being generally known to, and from not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure and use; and
>
> (b) is the subject of reasonable efforts to maintain its secrecy.

D.C. Code §36-401(4). But the information stored in the database is public information. Political campaigns, political action committees and grass roots lobbying organizations are not run in secret. Their leadership is public record, "readily ascertainable" to anyone willing to search a website or make a telephone call. These organizations are public organizations with a public purpose. It is in their interest to be available for contacts from persons outside the organizations.

The case relied upon by WCI involved a customer list that is quite different. In *Morgan Stanley DW inc. v. Rothe,* 150 F. Supp. 2d 67, 76 (D.D.C 2001), this court determined that "the customer lists of a financial services firm deserve trade-secret status." It makes perfect sense that a customer list of this sort would be a trade secret. Investors and those otherwise interested in financial advice do not make their interest in brokerage or financial services a matter of public record. Their identities must be

9

laboriously gathered through expensive marketing efforts. Their business interests are not served by making public their operations and personnel, as are the political campaigns served by WCI. Likewise, they do not have websites announcing that they are prospective investors available for a business contact.

Equally important, WCI made almost no effort to keep its contact information secret. Even its own supporting memorandum acknowledges that the WCI System "was available to Winning Connections' employees, <u>associates and consultants</u>." (Memorandum In Support, p. 19). But no contractual restrictions were placed on these associates and consultants with respect to the secrecy of the contact information. Moreover, secrecy was not enforced even among employees. Winning Connections had no written or oral security policy. (Gosselink Decl., ¶ 7). There was no company policy or guidance with respect to what information the company considered confidential or what information employees could or could not disclose to outsiders. (Id.). Although each WCI employee had a user ID and a password, which was required to log onto the company's computer network, employees were not required to log off of their computers when they left their desks for long periods or when they left overnight, and many did not. (Id.). There was no WCI policy that required employees to clean their desks of any work-related materials when they left the office. There were no locked filing cabinets or storage areas for use by employees. (id.).

WCI also makes the rather creative argument that Mr. Ilro Lee should not be permitted to work with Messrs. Gosselink and Chism because he created the WCI System and would inevitably disclose this highly valuable and tightly controlled trade secret. (Memorandum In Support, p. 20). WCI relies on *Pepsico, Inc. v. Remond,* 54

F.3d 1262 (7th Cir. 1995) for the proposition that a Court can enjoin prospective disclosure of a trade secret that would be inevitable, given the job assignment contemplated at the competitor. But Mr. Lee is hardly Redmond, who had a relatively high-level position that gave him access to inside information and trade secrets. In particular, Redmond knew the details of PepsiCo's "Strategic Plan" and its "Annual Operating Plan" which documents contained its plans to compete, financial goals, strategies for marketing, pricing structure, "attack plans" for certain markets, etc. The District Court found these to be a clear trade secrets. 54 F.3d at 1265  Redmond had also signed a confidentiality agreement with Pepsico that stated he

> w[ould] not disclose at any time, to anyone other than officers or employees of [PepsiCo], or make use of, confidential information relating to the business of [PepsiCo] . . . obtained while in the employ of [PepsiCo], which shall not be generally known or available to the public or recognized as standard practices.

54 F. 3d at 1264. Redmond was hired by Quaker Oats Company to head the division that marketed Gatorade and other sports drinks, with which PepsiCo's products were in fierce competition. The Court of Appeals ruled that the District Court had been correct in holding that Redmond's job at Quaker oats threatened the misappropriation of these trade secrets because his use of secret knowledge could not be avoided. *Id.* at 1271.

  WCI seeks an injunction to prevent Messrs. Gosselink and Chism from "stealing Mr. Lee from Winning Connections and hiring him to work for their directly competitive business" as if Mr. Lee were a piece of property with no mind of his own. (Memorandum In Support, p. 20). As we have shown, Mr. Lee voluntarily chose to depart WCI for the new venture after he waw made an inadequate equity offer by Mr. Jameson. (Lee Decl., ¶ 6). But more importantly, Mr. Lee has no knowledge similar to

that possessed by Redmond. Indeed, the only "trade secret" WCI claims he will disclose is the WCI System -- which is not a trade secret at all. WCI claims that Mr. Lee is the architect of the WCI System and can easily recreate it for the Defendants if he jumps ship." (Id.). This is true, but anyone with a passing familiarity with Microsoft Outlook, a product manual and Google could do the same. (Lee Decl., ¶ 3).

3. **The Plaintiff Can Show No Irreparable Harm Under Its Common Law Claims.** With respect to the harm from alleged breaches of common law duties, WCI has huffed and puffed and brought forth a mouse.

a. **Alleged Breach of Fiduciary Duty.** The Plaintiff's claim of breach of fiduciary duty against Mr. Gosselink is based on acts that are alleged to have already occurred. This is clear because the only fiduciary duty Mr. Gosselink could possibly have owed WCI is the one attendant to his employment. Now Mr. Gosselink is doing nothing but attempting lawful competition with his former employer, which is not prohibited by any fiduciary duty. WCI's attempt to prevent the operation of that business, on the other hand, is anticompetitive and contrary to public policy in and of itself. If any damage has been done to the Plaintiff as a result of Mr. Gosselink's past actions, then the relief is a question of money damages, not injunctive relief.

The case cited by the Plaintiff, *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1271-72 (D.D.C. 1997), makes this point. In *Riggs*, the Plaintiff was not seeking immediate relief in the form of a preliminary injunction for the breach of fiduciary duty or the solicitation of employees or clients. The decision was the result of a trial that occurred more than a year after the defendant had started its

12

business and begun to solicit clients and employees. *Id.* at 1254-55. The court found that money damages were appropriate for the alleged fiduciary violations. *Id.* at 1274.

Nonetheless, the Plaintiff has provided no proof that Mr. Gosselink has taken any particular "business methods" or "prospective pricing" information improperly. The Plaintiff's sweeping speculations are not supported by hard facts upon which the Court can base any injunctive relief. Even its allegation that Mr. Gosselink and Mr. Chism improperly solicited Mr. Lee is wholly inaccurate. The scope of WCI's proposed injunction shows that its real intent is to shut down Mr. Gosselink's new business. (Memorandum In Support, p. 1).

   **b. Alleged Misappropriation of Confidential Business Information**. The Plaintiff's apparent common law claim for misappropriation of confidential business information falls of its own weight. This is because WCI claims that the confidential business information misappropriated is the same information it claims is a trade secret in early portions of its Memorandum. The D.C. Uniform Trade Secrets Act preempts any common law or statutory vehicles for a civil remedy for misappropriation of a trade secret. D.C. Code § 36-407. Moreover, as discussed above, there are no trade secrets involved in this case at all.

   **c. Intentional Interference With Existing and Prospective Contractual Relations.** The Plaintiff does not identify the "numerous existing contracts with multiple clients for various services" it is losing or fears losing. (Memorandum in Support, at 24). WCI makes no allegation that it cannot continue to operate. The only "prospective" client it discusses is one in Florida about which it provides no details. There is no

showing whatever that it needs injunctive relief to retain this or any other client relationship.

Moreover, the Plaintiff omits an element required to make out a claim for tortious interference with contractual relation -- a showing that the defendant's actions are "improper." *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 239 (D.D.C. 1996). Competing with a business "'does not by itself constitute intentional interference with prospective business advantage' unless accomplished by wrongful or improper means…." *Id.* (quoting *International City Mgt. Ass'n Ret. Corp. v. Watkins*, 726 F. Supp. 1, 6 (D.D.C. 1989). Since Mr. Gosselink is not competing through any improper means, as set out above, he is legally entitled to compete against his former employer.

>   **d. Alleged Conversion**. The Plaintiff's conversion claim is solely based on allegations of conduct that could be addressed by money damages, if proven true. There is no continuing activity that could be addressed by immediate injunctive relief.

**4. Mr. Gosselink Will Be Substantially Injured If The Court Grants Preliminary Injunctive Relief and the Public Interest Will Not Be Served**. Because of the weakness of its claims and the sweeping relief it seeks, it is apparent that WCI is merely trying to prevent competition. This is not proper. *See* Committee on the Judiciary, Report on the District of Columbia Antitrust Act , Bill 3-107, at 1 (1980) (D.C. Code § 28-4502 - statutory prohibition against the restraint of trade is designed to foster innovation and independence in the local business sector by outlawing unreasonable restraints of trade). Lawful competition serves the public interest. WCI is not only trying to prevent competition, but it is trying to prevent Mr. Gosselink from making a living. To grant this motion is to put him out of a job. Not only is this extreme remedy not justified by the

Plaintiff, it will cause substantial injury to Mr. Gosselink by denying him ability to financially support himself.

### C. Conclusion

WHEREFORE, the Plaintiff cannot show that it will suffer irreparable harm or that it is in need of immediately relief.  As demonstrated above, WCI is not likely to succeed on the merits of its case.  Thus, Mr. Gosselink respectfully requests that the Court deny its Motion for Expedited Preliminary Injunction.

CHAD GOSSELINK,


/s/ *Scot A. Hinshaw*
Its Counsel

A. Neal Barkus (Bar No. 362893)
Thomas M. Hughes (Bar No. 460134)
Scot A. Hinshaw (Bar No. 449723)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC 20006
202-955-1500
202-778-2201 (facsimile)

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of December 2005, the foregoing Opposition To Expedited Hearing and declarations were served by the Court's electronic filing system and facsimile upon:

>David J. Farber, Esq.
>Patton Boggs LLP
>2550 M Street, N.W.
>Washington, D.C. 20037

and by e-mail on:

>James W. Craig, Esq.
>Phelps Dunbar LLP
>111 East Capitol Street
>Suite 600
>Jackson, MS 39225


/s/ *Scot A. Hinshaw*